RHODE ISLAND HOSPITAL TRUST COMPANY, Adm'r, *v.* HAZARD.

*(Circuit Court, D. Rhode Island.* February 17, 1881.)

1. WITNESS — PARTY TO SUIT — ACTION BY ADMINISTRATOR — REV. ST. § 858.

   In a suit by an administrator for the annulment of a contract, upon the ground of fraud and undue influence, the defendant is disqualified, by section 858 of the Revised Statutes, from testifying as to transactions and conversations with the decedent personally.

2. CONTRACT—FRAUD—INSANITY—EVIDENCE.—[ED.

*Wm. W. & S. T. Douglas* and *Charles Hart*, for complainants.

*Chas. S. Bradley* and *Benj. N. Lapham*, for defendant.

LOWELL, C. J. This bill is prosecuted by the administrator of John G. Copelin, late of St. Louis, Missouri, having been filed June 5, 1875, by the guardian of Copelin, who was then living, but insane. It alleges and charges that the defendant, Rowland G. Hazard, of Peace Dale, in Rhode Island, on the fourth of February, 1871, was the owner of three-fourths of the capital stock of the La Motte Lead Company, of Missouri; that the property of the company was a lead mine, encumbered by certain mortgages and debts, and was worth nothing beyond them; that the defendant sought the acquaintance of Copelin for the sole object and purpose of selling him as much as possible of said stock, and represented to Copelin that the mine was worth $3,000,000, and that

it could be sold for that sum; that it was making large profits; that he was willing to sell one-half his stock, being three-eighths of the mine, to Copelin for $225,000 cash, and the assumption by Copelin of three-eighths of the mortgage debt; that Copelin's mind had become at this time much impaired and weakened, so that he was incapable of managing his affairs intelligently, or comprehending the scope and effect of what he did, and was easily imposed on by the representations and flattery of others; that between the fourth and tenth days of February, 1871, the defendant did, by persistent and repeated representations so made to Copelin, induce him to buy the stock at the price before mentioned, and that an agreement for the purchase was made, which is copied into the bill; that Copelin paid the $225,000, and $37,500 of the debts; that Copelin was not capable of understanding even a true representation, but the defendant in fact greatly overstated the value of the property; that Copelin knew nothing of the property except what he learned from the defendant; that the defendant knew, or had reason to believe, that Copelin was not of sound mind; that in November, 1873, Copelin was found by a jury to be of unsound mind; and that in December, 1873, a guardian was appointed for him, who wrote to the defendant a letter rescinding the contract, and offering to return the stock.

The prayer is that the defendant may answer without his oath, that the contract and conveyance may be annulled, and the defendant be adjudged to pay the sum so received by him.

The answer denies all the specific allegations and charges concerning the state of mind of Copelin, and the defendant's knowledge thereof, and all the other facts relied on to show fraud or undue influence, and sets out at much length the circumstances of the purchase of three-fourths of the mine by the defendant, and his sale of one-half of his interest to Copelin; that the purpose and object of sale was in fact to procure the assistance of an able business man in Missouri; that Copelin was not known to him until this time, when he was introduced by a friend as being such a business man;

that Copelin examined the property and consulted with persons competent to advise him about the purchase; that the defendant made no representations as to value or profits, but referred him to his own examination for the former and to the treasurer of the company for the latter; that the mine was and is, in the opinion of the defendant and of experts, worth at least $3,000,000, and that it was contracted to be sold to certain English purchasers for that price soon after Copelin had bought, and the negotiation for the sale was mentioned to Copelin, in case it should come to a result, which the defendant did not then think very probable; that this sale was not consummated for the reason that the laws of Missouri did not at that time permit land to be held by aliens, and not for any reason connected with its value; that the purchase by Copelin had been ratified by himself and his attorneys in fact; that one of those attorneys had refused to return the property to the defendant at cost, and he denies all combination, etc.

Copelin was attacked with a disease of the brain known to physicians as general paralysis of the brain, was put under special charge and treatment for this disease in 1873, and died of it in 1875. It is a progressive disease, always fatal. One of its early symptoms is a great extravagance of ideas and of conduct, often manifested in making foolish and unnecessary purchases. The point of difficulty in the case is that of time. When did Copelin cease to be a speculator and become a lunatic? The symptoms unfortunately are common to sane and insane people.

There was nothing in this particular purchase which would necessarily convict a person of insanity. A mine is certainly a very difficult piece of property to appraise, and opinions about this mine vary all the way from nothing to $5,000,000 or $6,000,000. But two things are clear—that those best acquainted with mining, and with this mine, put the highest value upon it, and not a single witness who depreciated it has any special knowledge about it; and an English company, upon the report by experts sent out for the purpose, agreed to buy it for $3,000,000, and failed to conclude the

purchase for reasons not connected with any diminished confidence in its value. So far as market value can be predicated of such a piece of property, the weight of testimony is decidedly that it was worth all that Copelin paid for it. Whether it was wise or foolish to make such a purchase, would depend very much upon the amount which the purchaser could fairly afford to risk in a venture of the uncertain character of mining property, upon his willingness to wait for good times, if they became bad, and many other matters.

When the times changed, in 1873, great properties were lost, and many persons became bankrupt from the mere fall in market price of goods and lands, upon which they owed what they supposed to be a mere fraction of the true value. At the present moment those same properties may have recovered a considerable part of their former value. This mine was thus depreciated, and was sold for a very small price upon a foreclosure of a mortgage held by this defendant. In a letter printed in the record, the defendant attributes this loss, which the representatives of Copelin have suffered, to their having chosen to disavow the contract, instead of aiding him to pay the debt and preserve the property. With the foreclosure this case is not concerned.

There is no evidence of any fraud, misrepresentation, or undue influence on the part of the defendant. These allegations of the bill are unsupported, unless where they are disproved. There is no evidence that the defendant knew, or suspected, or had reason to know or suspect, that Copelin was of unsound mind; that the defendant sold the property to Copelin for more than he was ready to sell it for to others; that the transaction was in any respect, excepting its magnitude, different from any ordinary transaction of purchase and sale, so far as the defendant was concerned.

The sale was repeatedly ratified by Copelin and his attorneys, if he was capable of ratifying and of appointing an attorney. The complainants deny that a certain letter of the defendant to Copelin's attorney, Mr. Lackey, was an offer to rescind the bargain. It is not literally such an offer, but it is an intimation that the defendant has a right to rescind,

because Copelin has not taken charge of the business as he was expected to do, and Mr. Lackey's answer is an offer to rescind upon repayment of the money paid, with interest, and a considerable bonus. There were several other ratifications.

It was not until October, 1873, after the large profit of the English sale had failed to be realized, and after the change of time known as the "crisis" of that year had set in, that Mr. Copelin's friends procured him to be adjudged insane, and that the guardian wrote the letter avoiding this sale. Upon a remonstrance by the defendant, who wrote in vindication of the honesty of the transaction on his part, the guardian replied that the question was merely one of capacity to contract. The bill does not rely wholly upon the insanity of Copelin, but the evidence requires me to decide the case exclusively upon that point; because I am satisfied that the sale was not fraudulent, and that, if it were voidable for that cause, it has been ratified.

The plaintiffs maintain that Copelin was incapable of making or ratifying a contract in February, 1871, and incapable of appointing an attorney in July, 1871, when he went to Europe, and left full powers with Mr. Lackey.

It is not easy for the most honest and careful witnesses, looking back after an interval of years, to fix with any degree of accuracy the date of acts and conversations, each of which was wholly unimportant to them at the time; such as that six years or more ago they heard Copelin make an extravagant statement, or saw him do something odd and unusual. Most of the witnesses in this case decline to fix these reminiscences with positive dates. Certain things are proved, and certain things have not been proved. Copelin was a man of wealth and enterprise, largely concerned in business of various kinds, and having the control of still larger sums than he himself owned, belonging to his wife and her family. He was a director in many of the principal joint-stock companies in St. Louis. In the course of some months near about, but in most cases later than, the time of the purchase of this mine, he made other bargains of doubtful wisdom. In the

aggregate his speculations were very considerable, and it is probable that his family became alarmed. A great deal of evidence has been given to show on the one hand the extravagant character of these transactions, and on the other that they were not extravagant. The net result to his family, I fear, was a great loss.

In July, 1871, he went to Europe and traveled there some months for his health and recreation. In August, for the first time, a physician, expert in insanity, was consulted in Edinburgh. He pronounced Copelin insane, and in his deposition, (vol. 1, p. 177,) being asked his opinion, formed at the date of that examination, as to the length of time Mr. Copelin had been laboring under the effects of this disease, he says: "It is impossible to answer this question definitely. It may have existed a few months only, or a year or more. My opinion at the time was that it had existed several months." Whether by several months he meant six months, which would carry it back to about the date of the purchase, I do not know. All the other experts were consulted much later, and the weight of their opihion, so far as they are willing to express it, appears to be that it was possible, but not very probable, that the disease had begun as early as February, 1871.

The business of Copelin was conducted as usual until after his return from Europe. In December, 1871, and January, 1872, he resigned his several offices as president and director in the companies above mentioned. This may be taken as the time when he was found to be so clearly insane that the family and friends were obliged to make public admission of the fact. The three possible witnesses most competent to fix the exact dates—Copelin's wife, his mother-in-law, and his sister—have not been examined.

Taking these prominent and admitted facts into consideration, and reviewing the voluminous and detailed testimony in the record, I do not find it proved that Copelin was *non compos* February 10, 1871, nor that he was incapable of ratifying a contract after that time, or of making a power of attorney in July, 1871. I think a jury would not be war-

ranted in declaring that at the former of those dates he was incapable of transacting the ordinary affairs of life, or of making a will, or a contract of however solemn and important a nature.

These findings of facts make the disputed points of law unimportant. I ought to say, however, that the evidence of the defendant, taken in his own behalf, though not especially objected to at the time, is understood to be governed by a stipulation in the record that each party reserves all objections to matters of substance, and the complainant is right in insisting that by section 858 of the Revised Statutes the defendant's own evidence should not be received as to the transactions and conversations with Copelin personally. I have, therefore, not relied at all, in reaching my conclusions, upon testimony which comes within the prohibition of that section.

Bill dismissed, with costs.